**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2459-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

PHILLIPE BARTHELUS,
a/k/a PHILIPPE BARTHELUS,

     Defendant-Appellant.

_____

Submitted June 9, 2022 – Decided June 23, 2022

Before Judges Mawla and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 07-11-1010.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Phillipe Barthelus appeals from June 28, 2019 and October 8, 2020 orders entered following successive evidentiary hearings, regarding his petition for post-conviction relief (PCR). We affirm.

We recounted the relevant facts in our prior decision affirming defendant's convictions for the first-degree murder of Jamillah Payne, N.J.S.A. 2C:11-3(a)(1), first-degree attempted murder of Khalid Walker, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1), and other weapons and conspiracy offenses. State v. Barthelus, No. A-5012-10 (App. Div. Oct. 11, 2013) (slip op. at 2-3). The following facts relate to the PCR petition and this appeal:

> The incidents at issue occurred on the night of July 13, 2006[,] in and around . . . Payne's apartment, located on the fourth floor of a building in Elizabeth[,] . . . directly across the street from a park. The apartment was used as a "stash house" for drug dealers operating on the street and in the park.
>
> Raquel Garcia lived in another apartment in the building. She was friends with co-defendant Wedpens Dorsainvil,[] who was a drug dealer in the area. Garcia frequently "held" drugs for Dorsainvil in her apartment and, in return, he would pay some of her bills. Garcia identified defendant as one of several men who sold drugs with Dorsainvil.
>
> Garcia testified Dorsainvil came to see her on the morning of July 13, 2006[,] and told her he had been robbed at gunpoint earlier that morning by a group of men . . . . The men told Dorsainvil they "wanted him out of [Payne's] apartment," a location where he also

2

kept drugs. Garcia stated Dorsainvil was "pissed" and wanted to retrieve a "baseball size piece" of crack he had hidden in Garcia's apartment. Dorsainvil told Garcia to "[k]eep your eyes open, keep your ears open. Something isn't right. [Payne] isn't acting right. It's almost like she's turning on the hand that is feeding her."

Willie Smith had an apartment on the third floor of the building and sold cocaine in the park. He was acquainted with both Payne and Dorsainvil. In the evening of July 13, 2006, Payne called Smith and asked him to come up to her apartment. She sounded "disturbed a little bit." When he arrived at the apartment, Payne was sitting down in the living room and there were a number of men in the apartment with her, including Dorsainvil. Smith stated that Payne "looked different . . . . Face tones didn't look right." Smith asked Dorsainvil "what was going on," and he replied, "Fuck that. Don't worry about it."

Smith testified that Dorsainvil then went into the kitchen and returned with a handgun. When he returned to the living room, he fired the gun into the floor. This prompted Smith to jump out of the window to escape, fracturing his pelvis and suffering a punctured lung in the fall. As Smith was lying on the sidewalk, he heard three more shots being fired and saw Payne hanging from the window. He saw Payne fall to the ground near where he was lying. . . . Another individual, later identified as . . . Walker, then fell from the apartment window.

Walker, who admitted he was a member of the Bloods[ Gang], testified he had been in the apartment with five or six other men. At one point, he went into the bathroom to take a telephone call. While he was in the bathroom, three or four shots came through the

3

door; and one shot hit him in the leg. Someone kicked the door in and Walker saw one or two people in the doorway. Walker told the police that one of the men put a gun to his head and pulled the trigger, but the gun did not go off. However, Walker repudiated this statement at trial, explaining that the Bloods had a "code" that "snitches . . . die." Walker jumped out the bathroom window and landed in a pile of garbage. He . . . denied seeing Payne fall from the apartment.

Payne's friend, David Kernodle, was walking on the street outside the apartment at the time of the incident. He heard a "crashing sound" and then saw Smith "coming out" of the garbage area by the building, holding his side, and limping. He looked up and saw Payne "hanging out of the window." She appeared to be "[t]rying to get back in." Kernodle testified he saw defendant standing in the window from which Payne was hanging. He knew defendant from the area and testified that defendant had distinguishing scars on his arms, which he could see from the street. Kernodle testified defendant pushed Payne and she fell to the ground. . . .

. . . .

Maria Martinez lived in an apartment on the third floor. She heard gunshots and went to close her window. As she did so, she saw a group of people coming down the fire escape. Defendant then opened the window, came inside, gave Martinez "a slight push, to the side," and ran out the front door of the apartment. Martinez saw at least three other people run down the fire escape.

Back in her apartment, Garcia was lying in bed when she heard gunshots. Dorsainvil then called her and said, "I'm coming up. I'm coming up right now.

4

Open the door, open the door. Unlock the door." She let Dorsainvil in and saw that he had a "shirt with blood on it, a shirt balled up under his arm with blood on it, and . . . there were two guns in the shirt." Dorsainvil told Garcia, "I had to do it. I had to do it . . . I popped her." Dorsainvil further explained that Payne "knew too much" and, after he shot her, "they threw her out the window."

   . . . .

  Several weeks after the murder, Lavar Davis came to Garcia's apartment. He told her he had been in Payne's apartment on the night of the murder. Davis explained that Payne had "turned on them" by becoming "Blood on another set" and had "betrayed them" by letting the men who had robbed Dorsainvil into the apartment. There was a confrontation between the men and Dorsainvil and his friends. Someone told Dorsainvil, "You want to die or are you going to get the F out of this apartment and get your shit and go." Payne began to head for the door, but Davis grabbed her hair "and told her she is not going nowhere." Davis told Garcia that Payne was shot and "pushed out the window," and . . . warned Garcia that "whoever talks" to the police "will get dealt with."

[Id. at 3-8, 10 (fourth, fifth, sixth, and eighth alterations in original).]

When police interviewed defendant, he first claimed he was not in Elizabeth at the time of the shooting, then stated he was "in the park playing dice when he heard shots and saw people jump from the apartment window[,]" and then in a letter to the trial judge "admitted to selling drugs in the apartment

5

on the night of the murder, but claimed he 'ran[] for his life' when the shots were fired." Id. at 9-10 (second alteration in original).

In State v. Barthelus, Nos. A-2954-15 and A-3324-15 (App. Div. Dec. 22, 2017) (slip op. at 2) defendant and the State appealed from a March 9, 2016 order denying defendant's PCR petition without an evidentiary hearing, but reversing the attempted murder conviction due to the trial judge's failure to give a limiting instruction concerning the testimony of a detective. We noted "Dorsainvil pled guilty to Payne's murder" and Walker's attempted murder, and shortly thereafter "gave defendant a written statement purporting to exculpate defendant from any involvement in Payne's murder and Walker's attempted murder." Id. at 5. "Dorsainvil alleged he conspired with . . . John Zepherin, who was now deceased, to murder Payne. None of the witnesses who testified at defendant's trial identified Zepherin as one of the individuals present in the apartment at the time of the shootings." Id. at 5. Dorsainvil claimed Zepherin shot Payne, and Dorsainvil "shot at Walker . . . [and] defendant fled the apartment as soon as the shooting started and, therefore, was not involved in either offense." Id. at 5-6.

The PCR judge, who also served as the trial judge, rejected defendant's assertion Dorsainvil's statement constituted newly discovered evidence to warrant a new trial. Id. at 6. However,

> [o]ne of the themes defendant's attorney presented to the jury at trial was that the police improperly focused on defendant instead of investigating other suspects in the attempted murder of Walker. During her cross-examination of Detective Jorge Jimenez, the attorney attempted to advance this position by asking the detective a number of questions concerning his failure to pursue other leads. . . . Walker identified defendant as one of his assailants after participating in a photo array and, once that identification was made, the police had no need to look at other suspects. However, because the judge suppressed Walker's identification of defendant, the State could not present this information to the jury.
>
> As defense counsel continued this line of questioning, the State began to object, and noted that the attorney was opening the door to allow . . . Jimenez to disclose that he "was in possession of information that implicated [defendant] as the second shooter in that apartment[.]" During several side bar conferences on this subject, the judge cautioned defendant's attorney that if she continued to seek to demonstrate that the detective had no basis for limiting the investigation to defendant, the State would be permitted to ask the detective on redirect whether he had information that caused him to believe defendant was the second shooter.
>
> As the cross-examination proceeded, defense counsel identified a man, [Davis,] as a potential suspect and, through her questions, attempted to demonstrate

7

that . . . Jimenez failed to properly investigate him. On redirect, the judge permitted . . . Jimenez to testify that he did not have any information that led him to believe [Davis] was the second shooter. The State then asked the detective, "At that point were you in possession of information that [defendant] was, in fact, the second shooter in that apartment?" After the judge overruled defendant's objection, the detective replied, "Yes[,]" and the State asked no further questions about the subject.

Defense counsel did not request any limiting instruction concerning the jury's consideration of the detective's response and the judge did not issue a sua sponte charge on this testimony. In his PCR petition, defendant argued that his attorney provided him with ineffective assistance by continuing to pursue this line of questioning in the face of the judge's warning, and by opening the door to the State's introduction of improper hearsay evidence concerning the information the detective possessed.

However, the judge declined to consider defendant's ineffective assistance of counsel argument. Instead, on his own motion, the judge determined that he committed prejudicial error during the trial by not instructing the jury that the detective's statement that he possessed certain information "could not be used for the truth of the matter asserted; but solely for his state of mind of why he eliminated certain suspects versus others during the course of his investigation." In his direct appeal of his conviction for Walker's attempted murder, defendant did not challenge the failure of the judge to provide such an instruction. Nevertheless, the judge concluded that "[t]he omission of a limiting jury instruction warrants reversal of [defendant's] conviction for the attempted murder of . . . Walker."

8

[Id. at 7-10 (second, third, sixth, seventh, eighth, and ninth alterations in original).]

We concluded the judge erred by overturning the attempted murder conviction because defendant did not raise the failure to give the sua sponte limiting instruction on direct appeal and was barred from doing so on the PCR. Id. at 14-15. We remanded for an evidentiary hearing to address the contention defendant did raise in his petition "that his trial attorney was ineffective for pursuing the line of questioning that led to . . . Jimenez's testimony that he had information pointing to defendant as one of Walker's assailants, and, after the judge raised the issue sua sponte, for failing to request a limiting instruction . . . ." Id. at 16.

Judge Regina Caulfield conducted an evidentiary hearing following the remand, heard testimony from defendant's trial counsel, and issued a detailed written decision. She found trial counsel testified credibly and "provided effective assistance to defendant during his trial." Counsel's questioning was appropriate because she "attacked the credibility of each witness, questioned the adequacy of the police investigation, and highlighted the weaknesses in the State's case." Counsel challenged: the lack of DNA testing at the crime scene; the credibility of a fact witness, by showing he would not be charged if he implicated others; and Kernodle's claim he could see the scars on defendant's

arms from a distance, the fact he did not make the claim in his initial statement to police, and only did so when he was facing charges. Counsel also cross-examined Jimenez about the fact he promised Davis would not be charged if he cooperated with the investigation.

The judge found trial counsel's strategy was sound, stating:

> Here, defendant had the right to establish that there was another individual present at the time of the shooting. In addition, his counsel had a duty to point out that [Jimenez] ignored . . . Davis's likely involvement in the shooting. To do otherwise would have been to abandon what appears to . . . have been a viable third[-]party guilt defense.

The judge also found trial counsel was not culpable for violating the trial judge's ruling not to elicit testimony regarding Walker's suppressed identification of defendant. Indeed,

> [w]hile the prosecutor may have been frustrated by defense counsel's emphasis on Davis's possible involvement in the shooting of Payne and Walker, he should not have been permitted to elicit what amounted to inadmissible hearsay from the detective on re-direct. At the very least, the trial court should have provided a limiting instruction to the jury stating that such testimony could not be used as substantive evidence of defendant's guilt, but only as to Jimenez's state of mind in deciding not to pursue Davis as a suspect in the incident.
>
> . . . Instead of asking Jimenez about the existence of other evidence supporting the charges against

defendant, the prosecutor should have asked the detective if there was any evidence in the case which, in his opinion, supported . . . charges against Davis.

Without a limiting instruction "the jury . . . was left with the inescapable inference the defendant's identity as the second shooter of . . . Walker was provided by an unnamed, non-testifying witness." The jury was left to speculate that Jimenez had superior knowledge through hearsay information because

[i]t is clear that such testimony was significant to the jury since there was a request that it be read back during deliberations. That request gave the court a second opportunity to provide a limiting instruction telling the jurors . . . that they could not utilize such testimony as substantive evidence of defendant's guilt, but only for an explanation . . . as to why Jimenez conducted the investigation in the manner he described.

The judge concluded trial counsel "did her job, and did it well. She pointed out that Jimenez had ignored a likely participant in the shooting" and this line of questioning did not "'open[] the door' to the detective being permitted to imply that he had secured other evidence supporting the charges against defendant." Further, "[p]ointing out the weaknesses in the State's case . . . , including highlighting that Davis was never charged . . . and may have shot at Walker, was a sound and reasonable trial strategy."

Judge Caulfield found the record established a prima facie case of ineffective assistance of appellate counsel for not raising the issue of Jimenez's

11

testimony. She concluded the failure to do so could have prejudiced defendant "since there is a reasonable probability that . . . defendant's conviction for the attempted murder of Walker would likely have been vacated, had the issue been raised on appeal." She ordered a second evidentiary hearing, at which time appellate counsel testified and then issued a thorough written opinion on October 8, 2020, granting defendant's PCR petition.

The judge found appellate counsel's testimony not credible and inconsistent. His testimony regarding the contact he had with trial counsel after the trial was selective and inaccurate, and lacked credibility in describing trial counsel's representation of defendant in an unflattering light. The judge noted he misrepresented the legal standard for raising PCR issues on appeal.

Notwithstanding the credibility issues, the judge found appellate counsel's testimony credible regarding his admission "that, if he had realized [the trial judge] had not given a limiting instruction to the jury concerning Jimenez's hearsay testimony, he would have raised the issue in his appellate brief." Appellate counsel was ineffective because "he chose to forgo the subject of Jimenez's hearsay testimony on defendant's direct appeal, especially as it was presented to the jury twice without the benefit of a limiting instruction[;] . . . a clear appellate issue[.]" The judge concluded appellate counsel's "error led to

12

defendant suffering significant prejudice" and the "omission was obvious" because he "reviewed the transcripts and [trial counsel]'s brief [in support of a motion for a new trial, which addressed Jimenez's testimony at length] before submitting his appellate brief."

Appellate counsel was aware of the import of the trial judge's failure to give a limiting instruction regarding Jimenez's hearsay testimony, because "he attached a copy of defendant's judgment of conviction . . . to his brief" showing he received a consecutive sentence for Walker's attempted murder. "Jimenez's hearsay testimony that he had information about defendant being the second shooter [w]as even more damaging than Kernodle's testimony about having heard about Payne's shooting from others[;]" an issue appellate counsel pursued on appeal. Moreover, "the issue was highlighted when the jury asked for this specific testimony to be read back" and "[i]t was the trial court's obligation to guide the jury as to the proper use of such testimony." The judge concluded appellate counsel's failure to raise the "related issues of the hearsay testimony provided by . . . Jimenez and the trial court's failure to provide a limiting instruction, [prejudiced] defendant since there is a reasonable probability that . . . defendant's conviction for attempted murder of Walker would have been

13

reversed" because "[t]he evidence of defendant's guilt as to defendant being the second shooter in Payne's apartment was not overwhelming."

Judge Caulfield held the omission of the limiting instruction only affected defendant's attempted murder conviction of Walker because the jury's read back request of Jimenez's testimony "clearly related" to Walker's shooting "and not the murder of . . . Payne or the other charges in the indictment." Further, "defendant's convictions for the other charges set forth in the indictment were supported by the evidence," including Smith, Martinez, Kernodle, and Garcia's testimony.

Defendant raises the following point on appeal:

> TRIAL AND APPELLATE COUNSELS' INEFFECTIVE ASSISTANCE MANDATES THAT ALL OF DEFENDANT'S CONVICTIONS BE REVERSED.

Our review of a PCR claim after a court has held an evidentiary hearing "is necessarily deferential to [the] PCR court's factual findings based on its review of live witness testimony." State v. Nash, 212 N.J. 518, 540 (2013). Where an evidentiary hearing has been held, we should not disturb "the PCR court's findings that are supported by sufficient credible evidence in the record." Ibid. We review the trial court's legal conclusions de novo. Id. at 540-41.

Pursuant to these principles and having thoroughly reviewed the record, we conclude defendant's argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Judge Caulfield's findings of fact and conclusions of law that trial counsel was effective, and appellate counsel was not, is supported by the credible evidence in the record and unassailable. Moreover, her conclusion that appellate counsel's failures impacted only the attempted murder of Walker is likewise sound and does not merit our intervention. Defendant's other convictions clearly stood on separate evidence and appellate counsel's failure to raise the hearsay issue regarding Jimenez's testimony did not impact them.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2459-20